UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                        :
JOSEPH DELGRECO & COMPANY, INC., et al.,               :
                                                        :                  10 Civ. 6422 (PAE)
                                    Plaintiffs,         :
                                                        :                  OPINION & ORDER
               -v-                                      :
                                                        :
DLA PIPER L.L.P. (U.S.),                                :
                                                        :
                                    Defendant.          :
                                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Defendant DLA Piper LLP ("DLA"), a law firm, moves for summary judgment against

the Complaint of plaintiffs Joseph DelGreco and DelGreco & Co. (collectively, "DelGreco" or

"plaintiffs"), which alleges that DLA committed various acts of legal malpractice while

representing plaintiffs.  For the following reasons, DLA's motion is GRANTED.

**I.      Background**[1]

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' pleadings
and their submissions in support of and in opposition to the instant motion—specifically, the
Declaration of Jean E. Lewis in Support of Defendant's Motion for Summary Judgment ("Lewis
Decl.") (Dkt. 31) and attached exhibits; the Declaration of Hartley T. Bernstein in Opposition to
Defendant's Motion for Summary Judgment ("Bernstein Decl.") (Dkt. 34) and attached exhibits;
the Defendant's Local Rule 56.1 Statement of Material Facts (Dkt. 32) ("Def.'s 56.1"); and the
Plaintiffs' Local Rule 56.1 Statement of Material Facts (Dkt. 37) ("Pls.' 56.1").  Where facts
stated in a party's Statement of Material Facts are supported by testimonial or documentary
evidence, and denied by a conclusory statement by the other party without citation to conflicting
testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local
Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the
statement required to be served by the moving party will be deemed to be admitted for purposes of
the motion unless specifically controverted by a correspondingly numbered paragraph in the
statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the
movant or opponent . . . controverting any statement of material fact[] must be followed by
citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

### A.   The Parties

Joseph DelGreco ("Mr. DelGreco") is the sole shareholder of Joseph DelGreco &

Company, Inc. ("DelGreco"),[2] a New York corporation that sold high-end outdoor furniture.

DLA is a Maryland limited liability partnership.

### B.   DLA's Representation of DelGreco

DelGreco's claims of malpractice arise out of DLA's representation of DelGreco in

connection with (1) a transaction between DelGreco & Co. and East-West-International (Taiwan)

Enterprises ("Eastwest"); and (2) a lawsuit with Eastwest over that transaction.

### 1.   The September 2007 Transaction

On or about September 14, 2007, Mr. DelGreco and DelGreco & Co. retained DLA to

assist in the transaction with Eastwest, a Taiwan-based corporation.[3]  Def.'s 56.1 ¶ 3; Pls.' 56.1

¶ 3; Bernstein Decl. Ex. 7.

The transaction was aimed at creating an ongoing supplier/distributor relationship

between DelGreco and Eastwest.  As part of this transaction, DelGreco & Co. was to receive a

$1 million loan from Eastwest.  Lewis Decl. Ex. 4.  The transaction consisted of four distinct

agreements: (1) a promissory note in which DelGreco & Co. committed to repay the $1 million

loan from Eastwest; (2) a security agreement, which pledged the assets of DelGreco & Co. as

collateral for the loan; (3) a personal guarantee by Mr. DelGreco on the loan; and (4) a

---

References herein to a paragraph in a party's 56.1 statement incorporate by reference the
evidentiary materials cited in that paragraph.

[2] The Court uses "DelGreco" both to refer to the defendants collectively and to the corporate
defendant individually, except in discrete instances where, to assure clarity, the Court refers to
the corporate defendant as "DelGreco & Co."

[3] Eastwest has ownership in common with two other companies, Partrade and Dexter.  Bernstein
Decl. Ex. 40, ¶ 4.  For the purposes of the opinion, "Eastwest" will be used to describe all three
of these companies, because the three companies acted in concert in their dealings with plaintiffs.

manufacturing and license agreement, which delegated responsibilities for the manufacturing, distribution, and sales of the furniture, and granted to Eastwest the right to use the DelGreco name and particular furniture designs.  Def.'s 56.1 ¶ 5; Pls.' 56.1 ¶ 5; Bernstein Decl. Exs. 9–12.

DLA worked with Mr. DelGreco and Eastwest to draft these agreements.  On September 21, 2007, Mr. DelGreco executed signature pages for the transaction documents, in advance of the actual closing.  Def.'s 56.1 ¶ 17; Pls.' 56.1 ¶ 3; Lewis Decl. Ex. 18.  On or around September 26, 2007, the transaction closed and Eastwest wired $1 million directly to Mr. DelGreco.  Def.'s 56.1 ¶ 18; Pls.' 56.1 ¶ 18; Lewis Decl. Ex. 19; Bernstein Decl. Ex. 23.  At the time of closing, Mr. DelGreco was not provided with final copies of the transaction documents themselves.[4]

The promissory note required DelGreco to make an initial interest payment upon delivery of the note.  Lewis Decl. Ex. 10, ¶ 5.1.  Specifically, it required that DelGreco pay $767.12 in interest at the time the transaction closed, reflecting the interest due for the period from September 26, 2007 (the date of closing) and the first day of the next month.  Neither Mr. DelGreco nor DelGreco & Co. paid the initial interest payment at the time of closing, nor did DLA specifically notify them in writing that they were required to.  Eastwest did not notify DelGreco about this missed payment until July 2, 2008, and DelGreco ultimately never paid the $767.12.  *See* Oral Arg. Tr. 13.  This missed initial interest payment forms the foundation of several of plaintiffs' malpractice claims.

---

[4] For purposes of this motion, DLA has agreed that the following dates are accurate.  *See* Response of Defendant DLA LLP (US) to Plaintiffs' "Additional Facts at Issue and to be Tried" (Dkt. 41), ¶ 24.  In or around February 2008, Mr. DelGreco first received the signed license agreement from DLA.  On March 3, 2008, Mr. DelGreco first received a signed copy of the promissory note from Eastwest.  On June 3, 2008, Mr. DelGreco first received signed copies of the security agreement and guaranty, as they were exhibits to a subsequent federal court complaint by Eastwest.  Although the parties have stipulated to these dates, the Court notes that the Eastwest complaint was actually filed one month later, on July 3, 2008.

### 2.   Eastwest Declares Default

Between October 2007 and July 2008, DLA did not represent DelGreco in any relevant transactions.  *See* Deposition of Joseph DelGreco ("DelGreco Dep."), Lewis Decl. Ex. 22, at 150–51.

During that same period, the relationship between DelGreco and Eastwest deteriorated. On or about June 23, 2008, DelGreco's orders from Eastwest were "frozen."  Def.'s 56.1 ¶ 34; Pls.' 56.1 ¶ 34; Lewis Decl. Ex. 29.

On or about June 27, 2008, goods the parties had planned to sell were shipped from Belgium to the United States.  Eastwest and DelGreco disagreed about who actually owned the Belgian goods, Bernstein Decl. Exs. 36, 37, and Mr. DelGreco rerouted the goods to a different warehouse than Eastwest had agreed upon.  Lewis Decl. Exs. 31, 32.

On June 30, 2008, counsel for Eastwest sent a letter making several demands, including that plaintiffs reroute the Belgian shipment and immediately repay an unrelated $850,000 loan.[5] Bernstein Decl. Ex. 36.  This letter did not claim that DelGreco was in default as to any of the agreements, nor did it mention DelGreco's missed initial interest payment from the previous year.  *Id.*  On July 1, 2008, DelGreco, through counsel, replied by letter, stating that Eastwest's demands were unfounded and that it would not comply with any of them.  Bernstein Decl. Ex. 37.

On July 2, 2008, counsel for Eastwest sent a second letter to DelGreco, making various demands.  The letter was captioned "Notice of Material Breaches of Various Agreements."  *See*

---

[5] Eastwest had loaned DelGreco an additional $750,000, plus a $100,000 advance, in late 2007 or early 2008.  Def.'s 56.1 ¶¶ 22–23; Pls.' 56.1 ¶¶ 22–23; DelGreco Dep. 144–45.  This loan was unrelated to the transaction that DLA negotiated, and it is undisputed that DLA was not involved in it.  Def.'s 56.1 ¶ 24; Pls.' 56.1 ¶ 24; DelGreco Dep. 150–51.  None of plaintiffs' malpractice claims relate to this loan.

Letter from David Frazee to DelGreco & DLA Piper ("July 2 Letter"), Bernstein Decl. Ex. 38. In the July 2 Letter, Eastwest declared for the first time that DelGreco was in default on multiple agreements: the licensing agreement, the security agreement, the $850,000 loan, and the promissory note for the $1 million loan.  *Id.* at 3.  As to the promissory note, Eastwest stated that DelGreco was in default for two reasons: (1) failure to pay the initial interest payment of $767.12; and (2) failure to pay monthly interests payments on time for at least five different months.  *Id.*  This was the first time that Eastwest had noted, let alone protested, the missed initial interest payment to DelGreco.  Eastwest declared a default on the promissory note and declared that the entire unpaid balance on the $1 million loan was "immediately due and payable."  *Id.* at 4.  DelGreco retained DLA again soon thereafter, this time to represent it in connection with the dispute with Eastwest.  Def.'s 56.1 ¶¶ 44, 49; Pls.' 56.1 ¶¶ 44, 49.

### 3.   Eastwest's Lawsuits Against DelGreco and the Ensuing Arbitration

On July 3, 2008, Eastwest filed a complaint against DelGreco & Co. and Mr. DelGreco in United States District Court for the Southern District of New York.  Bernstein Decl. Exs. 40, 41. Eastwest alleged conversion of the Belgian goods, breach of the distribution agreement, and a claim for foreclosure on the collateral under the security agreement.  Bernstein Decl. Ex. 40. The missed initial interest payment was not mentioned in the complaint; only one allegation referred obliquely to DelGreco's "fail[ure] to make certain payments as those obligations came due under the Note."  *Id.* ¶¶ 15–16.  The majority of the allegations of default on the promissory note dealt with DelGreco's refusal to allow Eastwest access to its book and records, *id.* ¶ 16, and DelGreco's failure to preserve the collateral of the September 2007 transaction.  *Id.* ¶ 17.

As the suit moved forward, DLA recommended that DelGreco pursue arbitration, and on September 5, 2008, DLA filed a demand for arbitration on plaintiffs' behalf.  Lewis Decl. Ex. 42,

43.  The parties agreed to one arbitrator instead of three.  Def.'s 56.1 ¶ 58; Pls.' 56.1 ¶ 58; Lewis Decl. Ex. 53.

DLA assisted DelGreco in preparing for the arbitration, Def.'s 56.1 ¶¶ 54–55; Pls.' 56.1 ¶¶ 54–55, but DelGreco was having difficulty paying its legal fees.  Over the course of preparing for the arbitration, a DLA partner spoke directly to Mr. DelGreco about the need to pay overdue legal fees if DLA was going to continue to represent him in the dispute.  Def.'s 56.1 ¶ 56; Pls.' 56.1 ¶ 56; Lewis Decl. Exs. 48, 49.  DLA helped DelGreco apply, unsuccessfully, for litigation financing at least twice.  Def.'s 56.1 ¶¶ 59, 61; Pls.' 56.1 ¶¶ 59, 61; Lewis Decl. Exs. 54, 55.  By May 18, 2009, DLA's records indicated that DelGreco owed $275,000 in outstanding legal fees; the estimated cost of the arbitration going forward was an additional $605,000.  Bernstein Decl. Ex. 68.

Eventually, DLA decided to withdraw from representing DelGreco and Mr. DelGreco.  On June 22, 2009, on behalf of DLA, a DLA attorney emailed Mr. DelGreco seeking to confirm that he "under[stood] DLA is withdrawing as counsel effective as of the call tomorrow . . . ."  Def.'s 56.1 ¶ 64; Pls.' 56.1 ¶ 64; Lewis Decl. Ex. 57.  DLA also sought confirmation that Mr. DelGreco had "chosen to pursue the arbitration pro se as [his] own counsel . . . ."  *Id.*  The following day, Mr. DelGreco sent an email to DLA stating:

> Please be advised that given the restricted finances available, I shall need to proceed with the case with Eastwest International (Taiwan) Enterprises "pro se".  I do not want a postponement as time has become critical, and I will ask [the arbitrator] and opposing counsel to agree to move forward without depositions.

Lewis Decl. Ex. 58.

During the conference call on June 23, 2009, the arbitrator questioned Mr. DelGreco about representing himself *pro se*.  Although that colloquy was not transcribed, Mr. DelGreco

testified in his deposition in this case that he replied to the arbitrator, "I guess I have to" and that he "didn't have an option." DelGreco Dep. 226. It is undisputed that the arbitrator approved DLA's withdrawal at that time. Def.'s 56.1 ¶ 66; Pls.' 56.1 ¶ 66; DelGreco Dep. 227; Oral Arg. Tr. 29.

DelGreco proceeded to arbitration *pro se*. On September 16, 2009, the arbitrator issued an award. Bernstein Decl. Ex. 80. The arbitrator ruled against DelGreco on all its claims and in favor of Eastwest on all but one. *Id.* The final award was $4,572,902 for Eastwest. Bernstein Decl. Ex. 81.

### C.  The Present Lawsuit

On July 2, 2010, Mr. DelGreco and DelGreco & Co. brought this lawsuit, seeking $17 million in damages from DLA. The complaint includes four causes of action, for malpractice, negligence, recklessness, and intentional tort. All four causes of action, however, have a common foundation. Each is, ultimately, based on common allegations of legal malpractice, and requires, at minimum, a finding of negligence. DelGreco's claims can be further distilled into 13 allegations of episodes of malpractice, to wit, that:

> (1)  DLA Piper failed to properly negotiate the Transaction Documents, Compl. ¶ 104;
>
> (2)  DLA Piper failed to properly explain the Transaction and its terms and conditions to Plaintiffs, *id.* ¶¶ 105, 121(i);
>
> (3)  DLA Piper negligently and carelessly delivered the Note and other Transaction Documents to counsel for Eastwest without the Initial Interest Payment, *id.* ¶ 113; *see also id.* ¶¶ 107, 121(iv) (DLA Piper exchanged executed Transaction Documents without arranging for the "performance by [Plaintiffs] of simultaneous conditions" including making the Initial Interest Payment);
>
> (4)  DLA Piper negligently and carelessly failed to advise [Plaintiffs] that DelGreco & Co. was required to make the initial interest payment, *id.* ¶¶ 110, 121(iii);

(5)  DLA Piper failed to properly arrange for and schedule the closing of the Transaction, *id.* ¶ 106, including failing to provide a closing checklist, *id.* ¶ 121(v);

(6)  DLA Piper negligently and carelessly failed to provide Plaintiffs with a complete set of final documents prior to execution, *id.* ¶¶ 111, 121 (ii);

(7)   DLA Piper negligently and carelessly directed Mr. DelGreco to execute signature pages to the Transaction Documents without having been provided a complete set of documents, *id.* ¶ 112;

(8)  DLA Piper failed to retain copies of the Transaction Documents after the closing or to provide copies of those documents to Plaintiffs, *id.* ¶ 121(vi);

(9)  DLA Piper caused and/or allowed Transaction Documents including signature pages to be altered after Closing, *id.* ¶ 121(vii);

(10)  DLA Piper advised [Plaintiffs] to agree to arbitrate all of their disputes with the Eastwest Parties, even though by doing so [Plaintiffs] would be surrendering their right to appeal the decision, *id.* ¶ 121 (ix);

(11)  DLA Piper recommended that Plaintiffs agree to arbitrate the Eastwest dispute before a single arbitrator even though they had the right under the License Agreement to a three arbitrator panel, *id.* ¶ 121(x);

(12)  DLA Piper abandoned Plaintiffs on the eve of arbitration by withdrawing as counsel; *id.* ¶ 121(xi); and

(13)  DLA Piper improperly and inaccurately advised Mr. DelGreco that Eastwest would be able to force DelGreco & Co. into bankruptcy, *id.* ¶ 121 (viii).

Def. Br. 11–12.[6]

---

[6] Although this distillation of plaintiffs' claims into 13 categories was initially presented in defendant's brief, the Court finds the outline useful and will use it as a framework here. Plaintiffs' articulation of their claims is not materially different. *Cf.* Pls.' Br. 11, 14.

### D.  DLA's Motion for Summary Judgment

On May 18, 2012, DLA moved for summary judgment as to all claims.  Dkt. 29.  DLA principally argues that, to make out a prima facie case of legal malpractice, plaintiffs are required to come forward with expert testimony to the effect that DLA's conduct violated professional norms, but, except with respect to two episodes, DelGreco has not done so.  Those episodes are numbers 3 and 8 above—involving DLA's alleged failure to ensure the $767.12 interest payment was made at the time of closing; and DLA's alleged failure to retain copies of the Transaction Documents after the closing or to provide copies of those documents to plaintiffs.  As to those episodes, DLA argues that DelGreco has failed to adduce evidence on which a jury could find those alleged lapses to have been a proximate cause of harm to plaintiffs.

On June 21, 2012, DelGreco filed an opposition to the motion, Dkt. 33, and on July 12, 2012, DLA filed a reply.  Dkt. 39.  On July 30, 2012, the Court heard oral argument.

## II.      Discussion

### A.  Standards Applicable to Summary Judgment

To prevail on a motion for summary judgment under Federal Rule of Civil Procedure 56, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue of material fact only exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

### B.  Standards Applicable to Malpractice Claims

 "In a diversity action based on attorney malpractice, state substantive law . . . applies." *Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009) (quoting *Rubens v. Mason* (*Rubens II*), 527 F.3d 252, 254 (2d Cir. 2008)).  Here, both parties apply New York law in their submissions, and the Court agrees that such law applies:  Where "[t]he parties' briefs assume that New York law controls . . . such 'implied consent . . . is sufficient to establish choice of law.'" *Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).  Moreover, New York law is clearly applicable, because DLA's legal services were provided by its lawyers in New York to a New York corporation. *See Rubens v. Mason* (*Rubens I*), 387 F.3d 183, 192 n.4 (2d Cir. 2004).

To establish a claim of legal malpractice under New York law, a plaintiff must establish: "(1) attorney negligence; (2) which is the proximate cause of a loss; *and* (3) actual damages."

*Nordwind*, 584 F.3d at 429 (emphasis in original) (citation omitted); *accord Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 117 (2d Cir. 2002) (describing elements as "(1) a duty, (2) a breach of the duty, and (3) proof that the actual damages were proximately caused by the breach of the duty." (quoting *Tinelli v. Redl,* 199 F.3d 603, 606 (2d Cir. 1999))).  Each element must be established for a claim to succeed.  Thus, "[i]n order for a defendant to succeed on summary judgment, it must establish 'that the plaintiff is unable to prove at least one of the essential elements.'" *Rubens II*, 527 F.3d at 255 (quoting *Crawford v. McBride,* 755 N.Y.S.2d 892, 892 (2d Dep't 2003)); *see also Carney v. Philippone,* 332 F.3d 163, 167 (2d Cir. 2003); *Hatfield v. Herz,* 109 F. Supp. 2d 174, 179 (S.D.N.Y. 2000).

As to the attorney negligence element, "to show negligence in a legal malpractice case, a plaintiff must allege that the attorney's conduct 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession.'"  *Capogrosso v. Lecrichia*, No. 07 Civ. 2722 (BSJ), 2010 WL 2076962, at *5 (S.D.N.Y. May 24, 2010) (quoting *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006)).  A plaintiff, however, fails to state a claim for malpractice if he alleges only an "error of judgment" or a "selection of one among several reasonable courses of action."  *Achtman,* 464 F.3d at 337.  "Generally, an attorney may only be held liable for 'ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action.'"  *Id.* (quoting *Bernstein v. Oppenheim & Co.*, 554 N.Y.S.2d 487, 489–90 (1st Dep't 1990)).

As to the causation element, the Second Circuit has explained that "[t]o establish proximate cause, 'the client must meet a case within a case requirement,' and must demonstrate that a reasonable fact-finder could conclude that a 'reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence.'"  *Rubens II*, 527 F.3d

at 255 (quoting *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 780

N.Y.S.2d 593, 596 (1st Dep't 2004) and *Rubens I,* 387 F.3d at 189); *see also D'Jamoos v.*

*Griffith*, 340 F. App'x 737, 739 (2d Cir. 2009) ("'[A] plaintiff must show that but for the

defendant's negligence, . . . he would have prevailed in the underlying action or would not have

sustained any damages.'" (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 118 (2d Cir. 2005)));

*Tydings,* 843 N.Y.S.2d at 540 ("To establish proximate cause, the plaintiff must demonstrate that

'but for' the attorney's negligence, the plaintiff would have prevailed in the matter in question.").

   As noted, the final element of a malpractice claim is damages:  A plaintiff must

demonstrate he "suffered actual and ascertainable damages."  *Rubens I,* 387 F.3d at 189 (citing

*McCoy v. Feinman,* 99 N.Y.2d 295, 301–02 (2002).  This element is not at issue in this case, and

so the Court does not address it further.

### C.  Analysis

   Where, as here, a plaintiff points to multiple alleged breaches of duty, those breaches

should be analyzed individually to determine whether any violates the standard of care.  *See*

*Iannazzo v. Day Pitney LLP*, No. 04 Civ. 7413 (DC), 2007 WL 2020052, at *6 (S.D.N.Y. July

10, 2007); *Rubens v. Mason,* 417 F. Supp. 2d 262, 273–80 (S.D.N.Y. 2006).  As noted, DelGreco

has identified 13 distinct episodes of alleged malpractice.[7]  These episodes are usefully sorted

---

[7] In opposing the motion for summary judgment, DelGreco sorts these 13 claims into four
broader categories, alleging that DLA committed malpractice "(i) in connection with the
negotiation and delivery of the Note and Closing the Transaction (Compl. ¶¶ 103–113, 121); (ii)
by failing to properly advise Plaintiffs concerning the Initial Interest Payment, failing to ensure
the Initial Interest Payment was delivered, and causing DelGreco to default on the Note (*Id.* at
¶¶ 107–110, 113, 121); (iii) by providing self-serving advice that was not in the best interest of
its clients in connection with the arbitration and potential bankruptcy filing (*Id.* at ¶¶ 121 (viii),
121(ix), 121(x)); and (iv) by failing to properly prepare for arbitration and withdrawing as
counsel in an untimely and prejudicial fashion (*Id.* at ¶¶ 114–120, 121)."  Pls.' Br. 11.  This
alternative classification does not affect the Court's substantive analysis of the summary
judgment motion.

into two categories:  the 11 as to which DelGreco has adduced no expert evidence of negligence by DLA, and the two as to which DelGreco has done so.

### 1.   The 11 Claims Unsupported by Expert Opinion Evidence

In order to demonstrate a breach of a duty on the part of the attorney, the plaintiff must first establish the standard of care the attorney owed to the plaintiff.  The duty of care owed by an attorney must be shown by competent evidence; the plaintiff's case cannot rest on conclusory allegations of negligence.  *See Thaler & Thaler v. Gupta,* 617 N.Y.S.2d 605, 606 (3d Dep't 1994) (requiring that plaintiff offer "evidence to establish the standard of professional care and skill that [defendant] allegedly failed to meet").  In particular, a plaintiff must offer evidence to demonstrate that the attorney's conduct was unreasonable and not a mere "error of judgment." *Achtman,* 464 F.3d at 337.

Ordinarily, to make this showing, a plaintiff must come forward with an expert opinion to the effect that the defendant lawyer or law firm was negligent.  "The courts generally require malpractice plaintiffs to 'proffer expert opinion evidence on the duty of care to meet their burden of proof in opposition to a properly supported summary judgment motion.'"  *Hatfield*, 109 F. Supp. 2d at 179 (quoting *Estate of Nevelson v. Carro, Spanbock, Kaster & Cuiffo*, 686 N.Y.S.2d 404, 405–06 (1st Dep't 1999)); *see Iannazzo*, 2007 WL 2020052, at *6 ("Such a showing usually requires expert opinion . . . ."); *Nobile v. Schwartz*, 265 F. Supp. 2d 282, 288 (S.D.N.Y. 2003) ("Such showing in a summary judgment motion generally requires expert opinion evidence.");  s*ee also Ginor v. Landsberg*, 159 F.3d 1346 (2d Cir. 1998) (table) ("[T]he appellants' failure to produce expert evidence as to that standard of care was properly grounds for summary judgment . . . .").  The requirement that there be expert support for a claim of malpractice reflects the reality that a lawyer's duties to a client, particularly in complex or nuanced situations, are

often not self-evident to a lay person, and discerning the standard of care as to a particular legal problem is often outside of the ordinary experience of a lay fact-finder.  Expert testimony thus enables jurors to assess "the standard of care in the legal profession, whether the defendant-attorney failed to comply with that standard, and whether the negligence proximately caused any injury to the plaintiff-client."  *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 209 (S.D.N.Y. 2010).

The only circumstances in which expert opinion evidence is unnecessary are those in which "a jury could reasonably conclude, on the basis of their own ordinary experience, that defendant's conduct was so negligent as to fall below *any* standard of care."  *Hatfield*, 109 F. Supp. 2d at 180.  However, "[u]nless [1] a juror's ordinary experience provides sufficient basis to assess the adequacy of the professional service, or [2] the attorney's conduct falls below any standard of due care, expert testimony is necessary to establish that the attorney acted negligently."  *Sallam v. Nolan*, 116 F.3d 466 (2d Cir. 1997) (table) (brackets added) (citing *Greene v. Payne, Wood and Littlejohn*, 602 N.Y.S.2d 883, 885 (2d Dep't 1993)); *see also Nobile*, 265 F. Supp. 2d at 288 (dispensing with requirement of expert evidence where "ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service" (internal quotations omitted)); *Kranis v. Scott*, 178 F. Supp. 2d 330, 334 (E.D.N.Y. 2002) ("[U]nless the nature of Kranis's claim falls within either exception, he *must* introduce expert testimony in order to establish a *prima facie* case sufficient for presentation to the jury." (emphasis added)); *Northrop v. Thorsen*, 848 N.Y.S.2d 304, 308 (2d Dep't 2007) ("Expert testimony is normally needed . . . unless the ordinary experience of the fact-finder provides sufficient basis for judging the adequacy of the professional service, or the attorney's conduct falls below any standard of due care." (citation and emphasis omitted)).  These

exceptions, however, are reserved for the unusual case, in which the facts are "so egregious" as to make expert evidence unnecessary.  *Nobile*, 265 F. Supp. 2d at 290; *see also Kranis*, 178 F. Supp. 2d at 335 (exception reserved for "obviously negligent" conduct).  Examples include failure to follow direct orders from a court, *Smartix Int'l Corp. v. Garrubbo, Romankow & Capese, P.C.*, No. 06 Civ. 1501 (JGK), 2009 WL 857467, at *4 (S.D.N.Y. Mar. 31, 2009), and the "disregard or ignorance of . . . a clearly defined and firmly established rule."  *Northrop*, 848 N.Y.S.2d at 308.

In this case, DelGreco has identified a single expert, Jeffrey Haas, who has opined on the subject of DLA's alleged malpractice.  *See* Amended Expert Witness Disclosure Statement of Professor Jeffrey J. Haas ("Haas Report"), Bernstein Decl. Ex. 24.  Haas is a professor at New York Law School, has practiced as a corporate securities attorney, and has published extensively on corporations, contracts, and securities law.  Haas Report 1–2.  Haas, however, has opined as to only two of the 13 episodes as to which plaintiffs have claimed DLA's conduct constituted malpractice: DLA's alleged failure to ensure that the initial interest payment was paid at the time of closing, and DLA's alleged failure to retain copies of the Transaction Documents after the closing or to provide copies of those documents to plaintiffs.  As to both, he has opined that DLA's conduct was malpractice.  *Id.* at 1–3.  Haas, notably, did not opine as to the propriety of any other conduct by DLA which DelGreco has alleged to be legally deficient.

DLA argues, accordingly, that summary judgment should be granted in its favor as to the remaining 11 episodes, on the grounds that they entail conduct as to which, as a matter of law, a jury could not find negligence except on the basis of an expert's opinion.  In response, DelGreco claims, conclusorily, that these claims of negligence are of the type for which the "ordinary

experience of the fact finder provides sufficient basis for judging the adequacy of the professional service."  Pls.' Br. 12 (citing *Estate of Nevelson*, 686 N.Y.S.2d at 405).

DLA's analysis is persuasive on this point, and DelGreco's, emphatically, is not.  The 11 claims in question relate to DLA's (1) work negotiating and closing the transaction with Eastwest, *see* Compl. ¶¶ 104–106; (2) substantive advice regarding bankruptcy and arbitration, *id.* ¶¶ 121 (viii)–(x); and/or (3) withdrawal from the arbitration.  *Id.* ¶¶ 114–120, 121(xi)–(xiii). The actions of DLA's which DelGreco has challenged were taken in connection with complex areas of legal practice.  And DelGreco's claims that DLA's conduct was deficient necessarily entail complex questions as to DLA's duties in the face of the layered facts and difficult challenges with which it, and its client, were presented.  Simply put, these are not matters familiar to the ordinary lay fact-finder, or ones as to which a lay juror could reasonably be asked, without expert guidance, to assess whether a lawyer or law firm's behavior, under the assembled circumstances, fell below the standard of care.  *See, e.g.*, *Smartix Int'l Corp.*, 2009 WL 857467, at *5 (dismissing malpractice claim for want of expert evidence; claim involved discovery delays); *Nobile*, 265 F. Supp. 2d at 290 (dismissing malpractice claim for want of expert evidence; claim involved failure to appeal or file a derivative suit); *Hatfield*, 109 F. Supp. 2d at 181–85 (dismissing malpractice claim for want of expert evidence; claim involved failure to sufficiently prepare action for trial and to call certain witnesses); *Estate of Ginor v. Landsberg*, 960 F. Supp. 661, 672 (S.D.N.Y. 1996) *aff'd sub nom. Ginor v. Landsberg*, 159 F.3d 1346 (2d Cir. 1998) (dismissing malpractice claim for want of expert evidence; claim involved joint representation of parties in a transaction); *Merlin Biomed Asset Mgmt., LLC v. Wolf Block Schorr & Solis-Cohen LLP*, 803 N.Y.S.2d 552, 553 (1st Dep't 2005) (dismissing malpractice claim for

want of expert evidence; claim involved negligent drafting of purchasing and marketing agreements).

Furthermore, as to none of these 11 episodes has DelGreco come forward with lay evidence remotely suggesting that DLA's conduct was so obviously negligent that it would be clear to the ordinary juror that it breached its duty. The Court cannot, therefore, conclude that DLA's conduct fell below "any standard of due care" as a matter of law. *See Barnett v. Schwartz*, 848 N.Y.S.2d 663, 668 (2d Dep't 2007) (citation omitted); *see also Smartix Int'l Corp.*, 2009 WL 857467, at *2.

These 11 episodes thus do not fall within either of the exceptions to the ordinary requirement that there be expert opinion evidence to support a finding of legal malpractice. *Accord Kranis*, 178 F. Supp. 2d at 335. As a matter of law, DelGreco's allegations of malpractice as to these episodes cannot go forward.

Although it is unnecessary to reach the point, the Court has independently examined the proof adduced by DelGreco as to these instances of malpractice. It is safe to say that, as to many of the episodes with which DelGreco finds fault, even if DelGreco had somehow been able to muster expert opinion testimony in its favor, no reasonable juror could find a breach of duty. Rather, DLA's negotiations with Eastwest, the bankruptcy advice it rendered, and its endorsement of an arbitral rather than trial forum all constituted quintessential strategic advice. And, "[w]here a claim of legal malpractice is based upon a plaintiff's displeasure, developed only with the benefit of hindsight, regarding a defendant-attorney's selection of one among several reasonable strategic options, summary judgment should be granted in defendant's favor." *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 211 (S.D.N.Y. 2010) (citing

*Rosner v. Paley,* 65 N.Y.2d 736, 738 (1985) ("[S]election of one among several reasonable courses of action does not constitute malpractice.") and *Bernstein,* 554 N.Y.S.2d at 490).

The Court is also persuaded that a reasonable juror could not find that DLA's withdrawal from the arbitration was a breach of DLA's duty of care. DLA had good cause to withdraw and gave its client ample notice of its intent to withdraw; Mr. DelGreco assented to that withdrawal, as reflected in his June 23, 2009 email; and the arbitrator granted DLA permission to withdraw. On the record before the Court, it is clear that DLA met the requirements for withdrawal set forth in the New York Rules of Professional Conduct. *See* N.Y. Rules of Prof'l Conduct R.1.16(c)–(d) (2009).

Finally, even had there been sufficient evidence on which a jury could find negligence on DLA's part on these claims, DelGreco would still have had to demonstrate that these lapses proximately caused it damages. Here, however, the damages were occasioned by Eastwest's declaration of default. Given the multiple and overlapping reasons that Eastwest articulated for declaring default, in the Court's judgment, no reasonable juror could find that, but for the asserted malpractice, DelGreco "would have *prevailed* in the underlying action or would not have sustained *any* damages." *Allianz Ins. Co.*, 416 F.3d at 118 (emphasis added) (quoting *Aversa v. Safran,* 757 N.Y.S.2d 573, 574 (2d Dep't 2003)). DelGreco has not articulated any substantial reason to believe that DLA's representation, cured of the lapses DelGreco has alleged, would have materially changed the arbitrator's award.

### 2. DelGreco's Claim as to the Missed Initial Interest Payment

In contrast, DelGreco has submitted expert testimony in support of its claim that DLA was negligent with respect to DelGreco's missed initial interest payment. Specifically, in his three-page report, Haas opined:

> The Defendant deviated from the standard of care in connection with its representation of Plaintiffs by not ensuring that DelGreco & Co. made the first required interest payment on the Note upon the execution and delivery of the Note pursuant to Section 5.1 of the Note, thereby triggering a default thereunder.

Haas Report 2. Haas explained that "[a]n attorney in a closing has the obligation to ensure that its client is not in default under transactional documents right out of the gate, as happened here." *Id.* at 3. He opined that DLA could have satisfied that obligation in various ways, so as to meet the requisite standard of care. These include arranging the transaction between DelGreco and Eastwest so as to ensure that the initial interest payment was paid before the signature pages were released, or even netting the interest payment out of the loan proceeds. *Id.* at 2–3. However, he stated, DLA failed to take any of these steps. *Id.*

Although DLA disputes some of the facts on which Haas's opinion is premised—DLA, for example, claims that it orally advised DelGreco that the interest payment was due on closing, *see* Deposition of David Mason ("Mason Dep."), Bernstein Decl. Ex. 8, at 62–63—DelGreco has made a sufficient showing of negligence as to this claim. Viewing all evidence in the light most favorable to plaintiffs, as the Court must, *Celotex Corp.*, 477 U.S. at 323, DelGreco has adduced evidence of actions or inactions which an appropriately qualified expert, Haas, has plausibly opined fell short of professional norms.

However, for DelGreco's claim of malpractice to survive summary judgment, DelGreco must also adduce sufficient evidence of causation—*i.e.*, evidence on which a reasonable jury could find that DLA's breach of duty proximately caused it damages. *Nordwind*, 584 F.3d at 429; *Rubens II*, 527 F.3d at 255. "'[T]he failure to demonstrate proximate cause mandates the dismissal of a legal malpractice action regardless of whether the attorney was negligent.'" *Capogrosso*, 2010 WL 2076962, at *5 (quoting *Tydings v. Greenfield, Stein & Senior, LLP*, 843

N.Y.S.2d 538, 540 (1st Dep't 2007)).  The causation requirement is "a high bar to attorney malpractice liability" and "'seeks to insure a tight causal relationship exists between the claimed injuries and the alleged malpractice, and demands a nexus between loss and injury.'" *Flutie Bros. v. Hayes*, No. 04 Civ. 4187 (DAB), 2006 WL 1379594, at *5 (S.D.N.Y. May 18, 2006) (quoting *Sloane v. Reich,* No. 90 Civ. 8187 (SS), 1994 WL 88008, at *3 (S.D.N.Y. Mar. 11, 1994)).

In the paradigmatic malpractice case, the allegation is that the defendant's professional lapses caused the plaintiff to lose an underlying legal action.  It is well-established that a plaintiff in these circumstances must show but-for causation—that "but for" the attorney's negligence, the plaintiff would have prevailed in the underlying action.  *See D'Jamoos*, 340 F. App'x at 739; *Tydings*, 843 N.Y.S.2d at 540.

DelGreco argues that a different standard should apply here, and that it need show only that that attorney negligence was "*a* proximate cause" of harm to it—*i.e.*, one independent cause of such harm.  Pls.' Br. 12–13.  In support of this claim, DelGreco relies on *Barnett v. Schwartz*, 848 N.Y.S.2d 663, 668 (2d Dep't 2007).  *See id.*  But *Barnett* recognizes that:

> In the main, the cases from the Court of Appeals, including the most recent, do not expressly require that the negligence be either "the" or "a" proximate cause of damages, but require proof that, "but for" the negligence of the defendant-attorney, the plaintiff-client would have prevailed in the underlying action (in a classic lawsuit-within-a-lawsuit scenario) or would not have incurred damages (in an action alleging negligent advice, etc.)

*Id.* at 668; *accord Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007) ("To establish causation, a plaintiff must show that he or she would have prevailed in the underlying action or would not have incurred any damages, but for the lawyer's negligence."); *AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 434 (2007) ("[A] plaintiff must

establish . . . that the plaintiff would have succeeded on the merits of the underlying action 'but for' the attorney's negligence.").

A point of clarification is useful here:  Although courts commonly use the term "proximate cause" to describe the requisite element of a legal malpractice claim, those same courts, applying that standard, go on to inquire whether the attorney's negligence was a "but for" cause of harm to the client.  *See, e.g.*, *Allianz Ins. Co.*, 416 F.3d at 118 ("'To establish the element[] of *proximate cause* . . . , a plaintiff must show that *but for* the defendant's negligence, he or she would have prevailed in the underlying action or would not have sustained any damages.'" (emphasis added) (quoting *Aversa*, 757 N.Y.S.2d at 574));  *Wolfson*, 844 F. Supp. 2d at 356–57 (collecting cases);  *accord O'Callaghan v. Brunelle*, 923 N.Y.S.2d 89, 91 (1st Dep't 2011), *appeal denied*, 18 N.Y.3d 804 (2012) ("[Plaintiff] failed to establish *proximate cause* in that *but for* defendants' alleged malpractice, he could have prevailed on the underlying claim." (emphasis added) (citation omitted));  *Bishop v. Maurer*, 823 N.Y.S.2d 366, 367 (1st Dep't 2006), *aff'd*, 9 N.Y.3d 910 (2007);  *Reibman v. Senie*, 756 N.Y.S.2d 164, 165 (1st Dep't 2003);  *Zarin v. Reid & Priest*, 585 N.Y.S.2d 379, 381 (1st Dep't 1992).  The Court, accordingly, measures the evidence against the standard of but-for causation, recognizing that courts have used inconsistent vocabulary to capture this concept.

Turning to the facts at hand, DelGreco's claim is that, but for DLA's negligence in connection with the transaction, it would not have been in default on July 2, 2008, when Eastwest sent its notice of material breach, and thus would not have lost at the subsequent arbitration.  Pls.' Br. 16–18.

Expert testimony can be used to show causation, where the connection between the negligence and the injury would not be clear to the ordinary fact-finder.  *See D'Jamoos*, 340 F.

21

App'x at 739 (affirming grant of summary judgment for defendant where "plaintiff has failed to put forth evidence that would permit a rational fact-finder to conclude that [defendant's] conduct proximately caused damages to plaintiff"); *Stonewell Corp.*, 678 F. Supp. 2d at 209 ("Expert testimony is sometimes required to establish the standard of care in the legal profession, whether the defendant-attorney failed to comply with that standard, and whether the negligence proximately caused any injury to the plaintiff-client." (citation omitted)); *Kranis*, 178 F. Supp. 2d at 335 ("[I]t would not be clear without expert testimony if such negligence was the proximate cause of any alleged damages.").  Plaintiffs have not offered such evidence.[8]

The Court, then, must examine the record to determine whether, based on the non-expert evidence it contains, a reasonable jury could find in favor of DelGreco on the element of causation.  As to the missed initial interest payment, the Court concludes that the record does not support any such finding, and that no reasonable jury could find that, had the initial interest payment been paid on time (or before July 2, 2008), DelGreco would not have defaulted.

First, the record is devoid of any evidence that the failure to pay the initial $767.12 interest payment was even referred to between the parties, let alone cited by Eastwest as a basis for default or used by Eastwest as leverage in any way, until it filed its notice chronicling multiple material breaches on July 2, 2008.  Oral Arg. Tr. 11.  Indeed, the record nowhere

---

[8] To be sure, Haas's report included statements about causation, including that the missed initial interest payment triggered cross-defaults of the security agreement and the license agreement, "causing the entire Transaction to unravel."  Haas Report 3.  But in his deposition, Haas expressly disavowed that opinion.  He stated that he was being offered, and was opining, as an expert *only* as to the standard of care, and was "not being offered as an expert to testify on causation in this matter."  Deposition of Jeffrey Haas ("Haas Dep."), Lewis Decl. Ex. 61, at 33.  As to the statement in his report to the effect that the missed interest payment "caus[ed] the entire Transaction to unravel," Haas stated: "[T]hat's not my opinion.  That was my understanding of what happened."  Haas Dep. 33.  In light of Haas's categorical disavowal of the statements in his report relating to causation, plaintiffs cannot claim to have adduced expert evidence on the causation element (or at least expert evidence that a reasonable jury could credit).

suggests that Eastwest even knew of this breach before its July 2, 2008 letter to DelGreco. Significantly, Eastwest designated a corporate witness, Bobby Harrell, to testify on its behalf in this case, pursuant to Federal Rule of Civil Procedure 30(b)(6).  Harrell testified that, as of the time the loan closed in September 2007, Eastwest had been unaware that DelGreco had failed to pay the initial interest payment.  Deposition of Bobby Harrell ("Harrell Dep."), Lewis Decl. Ex. 38, at 28.  Harrell further testified, on behalf of Eastwest, that DelGreco's failure to pay the initial interest payment did not matter to Eastwest and had no bearing on Eastwest's relationship with DelGreco & Co.  *Id.*  Plaintiffs have not rebutted this testimony.

The arbitration record confirms this conclusion:  In its statement of claims, Eastwest asked the arbitrator to award it default interest beginning from July 2, 2008, the date of the declared default, and not from September 26, 2007, the date of closing, when the interest payment had been due.  Bernstein Decl. Ex. 56, at 27.[9]

Second, and pivotally important, there were abundant other—and more momentous— bases for DelGreco's default.  In fact, from the outset of the dispute, Eastwest claimed that DelGreco was in material breach of various of its obligations.  As recited in Eastwest's notice of material breach, these included the guaranty and the licensing agreement.  They also included the rerouting of the shipment from Belgium, which was, undisputedly, unrelated to the missed initial payment.  *See* July 2 Letter.  Any of these breaches, standing alone, was easily sufficient to cause plaintiffs to default on the promissory note.  And Eastwest's notice of material breach listed other acts or omissions by DelGreco, which, it asserted, violated DelGreco's contractual commitments.  *Id.*  These included DelGreco's diversion of the Belgian shipment, its failure to

---

[9] Notably, in his award, the arbitrator did not commence the running of default interest until September 5, 2008, nearly a year after the initial interest payment had been missed.  Bernstein Decl. Ex. 80, ¶ 2(a).  This suggests that the arbitrator, too, did not find that DelGreco's default should be traced to the date of the closing.

pay invoices in the amount of $273,090.84, and its misrepresentation of the status of the

DelGreco & Co. trademark. *Id.* at 2. Each of these acts was a clear material breach of the

licensing agreement. Eastwest also claimed that DelGreco had violated the security agreement

by refusing to allow Eastwest to inspect DelGreco & Co.'s books. *Id.*

These breaches in turn affected the $1 million promissory note, which incorporated by

reference all of the transaction documents. The promissory note contained an acceleration clause

that triggered in the event that the licensing agreement or security agreement was terminated.

Bernstein Decl. Ex. 12 ("Licensing Agreement") § 14; Bernstein Decl. Ex. 10 ("Security

Agreement") § 7. Eastwest's representative, Harrell, further testified that Eastwest would not

have loaned plaintiffs $1 million under the promissory note if the deal had not included the

acceleration clause. Harrell Dep. 20–22. Simply put, as a result of any of these other breaches,

Eastwest had the right under the agreements to demand immediate repayment of all of plaintiffs'

debt obligations, regardless of whether DelGreco had paid or failed to pay the initial $767.12

interest payment. Licensing Agreement § 14.1; Security Agreement § 8.

DelGreco offers no coherent theory why Eastwest would have viewed these breaches (all

of which dwarfed the $767.12 missed interest payment in size and scale) in any different light

had the initial interest payment been made. DelGreco's one argument is that the missed interest

payment was different in kind from the other breaches, because it alone was not curable. *See*

Oral Arg. Tr. 33. But this argument is ultimately unpersuasive, because DelGreco undisputedly

failed to pay numerous other interest payments on time (for which DLA is not claimed to have

been at fault), and, based on DelGreco's logic, each of these would have supplied an incurable

basis for default. July 2 Letter at 3. Specifically, the record shows that DelGreco was late on its

interest payments at least five other times, beginning with the interest due for October 2007, *id.*;

therefore, by DelGreco's theory, plaintiffs were incurably in default by November 5, 2007.  And DelGreco has not offered any theory as to why the missed initial interest payment (for which DLA can be held responsible) compelled DelGreco to be late in paying the ensuing interest payments.  Put differently, under DelGreco's theory that dilatory interest payments are non-curable bases for default, the initial payment cannot be a but-for cause of its default, because there were at least five other parallel occasions giving rise to an equal (and equally non-curable) basis for default.

For these reasons, no reasonable juror could find that DLA's negligence in failing to cause DelGreco to make an initial $767.12 interest payment on time was a but-for cause of DelGreco's later default.  There were too many other independent, and far more consequential, bases for default, for this claim to be credible.  The Court, therefore, enters summary judgment for DelGreco on this claim, too.

### 3.   DelGreco's Claim as to DLA's Failure to Provide It With Documents

DelGreco also offers expert evidence that DLA was negligent in failing to deliver the final transaction documents to it.  Haas opined:

> The Defendant deviated from the standard of care in connection with its representation of Plaintiffs by not providing copies of the Transaction Documents in their definitive form to Plaintiffs at the time of the Closing.

Haas Report 3.  The Court finds that, on this point, DelGreco has adduced sufficient evidence on which a reasonable jury could find DLA negligent.

With respect to this lapse, too, however, DelGreco fails to articulate a credible theory as to why DLA's negligence caused its default.  As best as can be discerned, DelGreco's argument is that had it received copies of the transaction documents in their final form, DelGreco could have ensured that the initial interest payment was paid to Eastwest.  *See* Pls.' Br. 20.  But even

assuming that this were so, this lapse would be no more than derivative of the lapse which the Court has already addressed—DLA's failure to cause DelGreco to pay its initial interest rate on time.  Because the Court has found that the missed initial interest payment *itself* did not proximately cause DelGreco's losses, it follows that an antecedent act of legal malpractice that had no effect other than to cause this interest rate to be missed also could not have prevented default.

The Court, therefore, holds that, as to this final claim of legal malpractice, DelGreco has failed to adduce sufficient evidence of causation, and thus has not made out a *prima facie* case of malpractice.  Summary judgment is therefore warranted in DLA's favor.

### 4.   Other Claims

As noted, in addition to its malpractice, DelGreco has brought three other claims against DLA, sounding in negligence, recklessness, and intentional tort.  Compl. ¶¶ 138–162; Pls.' Br. 25.  However, each of those claims is predicated on the same claim of professional lapses as the legal malpractice claim.  All of DelGreco's claims arise from the same set of facts, and thus summary judgment should be granted in DLA's favor for all claims.

**CONCLUSION**

For the reasons stated herein, DLA's motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate the motion at docket entry number 29 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: October 1, 2012
      New York, New York